**GRUNTAL & CO., INC., Plaintiffs,**

v.

**Ronald STEINBERG and Carolyn Steinberg, Defendants.**

Civ. A. No. 93–4323 (AJL).

United States District Court,
D. New Jersey.

June 10, 1994.

Robert J. Kipnees, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, for plaintiffs.

Ronald Steinberg, Carolyn Steinberg, pro se.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Gruntal & Co., Inc. ("Gruntal") against defendants Ronald Steinberg and Carolyn Steinberg (the "Steinbergs"), for declaratory judgment as to Gruntal's obligation to arbitrate and a permanent injunction against arbitration. Jurisdiction is alleged pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and 28 U.S.C. §§ 1331 and 1332.

By opinion and order, filed 12 October 1993, an application by Gruntal for a preliminary injunction against arbitration was granted (the "Preliminary Injunction").[1]  *See Gruntal & Co., Inc. v. Steinberg*, 837 F.Supp. 85 (D.N.J.1993) ("*Gruntal I* "). By opinion and order, filed 5 January 1994, the parties's cross-motions for summary judgment were denied and the Preliminary Injunction was vacated.[2]  *See Gruntal & Co. v. Steinberg*, 843 F.Supp. 1 (D.N.J.1994) ("*Gruntal II* ").

---

1. In support of its application for a preliminary injunction, Gruntal submitted: Complaint, filed 29 September 1993 (the "Complaint"); Certification of David Rappaport (the "Rappaport PI Cert."). The Steinbergs did not submit papers or otherwise appear in response to the Gruntal preliminary injunction application.

2. In support of their motion for summary judgment and in opposition to Gruntal's cross-motion for summary judgment, the Steinbergs submitted: Defendant's Brief in Support of A Request for a Summary Judgment (the "Steinberg SJ Brief"); Response and Motion for a Summary Judgment and/or Motion to Dismiss

for Failure to State A Claim (the "Steinberg SJ Response"); Certification of Ronald Steinberg (the "Steinberg Cert."); Defendants' Brief in Opposition to Plaintiff's Cross–Motion for Summary Judgment and in Support of Defendants' Motion for Collateral Estoppel (the "Steinberg SJ Reply Brief").

In support of its cross-motion and in opposition to the Steinbergs' motion, Gruntal submitted: Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and/or Motion to Dismiss for Failure to State A Claim and in Support of Plaintiff's Cross–Motion for Summary Judgment (the "Gruntal SJ Brief"); Plaintiff's Statement Pursuant to General Rule 12G (the "Gruntal 12G"); Certification of David Rappa-

On 2 May 1994, a bench trial (the "Trial") was held to determine whether Gruntal was entitled to permanent injunctive and declaratory relief against arbitration. For the reasons stated below, Gruntal's application for declaratory relief and a permanent injunction against arbitration is granted.[3]

*Procedural History*

In or about April to May 1993, the Steinbergs initiated two separate arbitration proceedings (collectively, the "Arbitration Proceedings") against Gruntal before the National Association of Securities Dealers ("NASD"). The Arbitration Proceedings were assigned NASD Case Numbers 93–01699 and 93–01887. *See* Complaint, Ex. B; Rappaport PI Cert., ¶ 5.

Gruntal subsequently moved before the NASD to dismiss the Arbitration Proceedings on the ground that "Gruntal never entered into any contract or agreement of any nature with the [Steinbergs] to arbitrate any dispute before the NASD, or indeed before any other arbitration forum." Rappaport PI Cert., ¶ 6. By memorandum, dated 10 September 1993, the NASD declined to rule on Gruntal's motion to dismiss and referred the question of arbitrability to the arbitration panel. Steinberg SJ Response, Ex. C; Rappaport PI Cert, ¶ 6.

Gruntal filed this action on 29 September 1993. The Complaint seeks "a [d]eclaratory [j]udgment declaring that Gruntal has no obligation to [the Steinbergs] to arbitrate the claims raised by the [Steinbergs] in the Arbitration Proceedings." Complaint, ¶ 21. The Complaint further seeks a preliminary and permanent injunction enjoining the Steinbergs from "pursuing their claims in the Arbitration Proceedings." *Id.*, ¶ 26.

Also on 29 September 1993, Gruntal made application for an order to show cause why a preliminary injunction should not issue, enjoining the Steinbergs from pursuing the Arbitration Proceedings against Gruntal pending the outcome of this case on the merits (the "Order to Show Cause"). The requested Order to Show Cause was entered on the same date.

The Steinbergs failed to respond to the Order to Show Cause, either by appearance or by written submission. In light of this failure, and for good cause shown by Gruntal, the Arbitration Proceedings were enjoined pending outcome of the case on the merits. *See Gruntal I,* 837 F.Supp. at 94.

In November 1993, the parties cross-moved for summary judgment. The motions were denied because genuine issues of material fact existed as to whether Gruntal was bound to arbitrate with the Steinbergs in the Arbitration Proceedings. The Preliminary Injunction was vacated on the ground that the Steinbergs had produced facts which substantially controverted Gruntal's likelihood of success on the merits and Gruntal had failed to address these facts. *See Gruntal II,* 843 F.Supp. at 15. The Trial followed.[4]

*Facts*

Gruntal is, and has at all relevant times been, a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Complaint, filed 29 September 1993 ("Complaint"), ¶ 1. Gruntal is a securities broker-dealer and a member of the NASD. Rappaport PI Cert., ¶ 2. Gruntal maintains a branch office in Fort Lee, New Jersey. Complaint, ¶ 2.

The Steinbergs are individuals residing in Baltimore County, Maryland. It is alleged the Steinbergs are "citizens of the State of Maryland." *Id.*, ¶ 3.

From November 1982 through March 1988, the Steinbergs held two trading ac-

---

port (the "Rappaport SJ Cert."); Certification of Katharine Nathan (the "Nathan Cert."); Letter–Brief, dated 24 November 1993 (the "Gruntal SJ Reply Letter"); Further Certification of Katharine Nathan (the "Nathan Supp.Cert.").

3. Gruntal's trial submissions included: a trial brief, dated 10 March 1994 (the "Gruntal Trial Brief"); a list of proposed witnesses, dated 10 March 1994 (the "Gruntal Witness List").

The Steinbergs' trial submissions included: a trial brief, dated 8 March 1994 (the "Steinberg Trial Brief"); a document list, dated 8 March 1994 (the "8 Mar. Document List"); a document list, dated 17 March 1994 (the "17 Mar. Document List"); a document list, dated 1 May 1994 (the "1 May Document List").

4. Citations to the transcript of the Trial will be as: "Tr. at ____."

counts with the securities brokerage firm of Philips, Appel & Walden ("Philips") through Philips' office located in Fort Lee, New Jersey (the "Fort Lee Office"). Rapport PI Cert., ¶ 2. During that period, Philips had numerous other branch offices.[5] *Id.,* ¶ 3.

*The Asset Purchase Agreement*

On or about 18 April 1988, Gruntal entered into an agreement (the "Asset Purchase Agreement") with Philips by which Gruntal "agreed to purchase certain specified assets of Philips' [Fort Lee Office]." *Id.; see* Asset Purchase Agreement, introduced by Gruntal as Exhibit P5. The Asset Purchase Agreement transferred to Gruntal "[a]ll right, title and interest of [Philips] in and to the furniture, leasehold improvements, equipment, machinery, supplies and other assets owned by [Philips] which are presently located or used at the [Fort Lee Office]." Asset Purchase Agreement, ¶ 1(a).

The Asset Purchase Agreement also transferred to Gruntal the "[g]oodwill, other intangible assets and written information and operating data possessed by [Philips] relating to the retail brokerage business presently conducted by [Philips] at the [Fort Lee] Office...." *Id.,* ¶ 1(b). Gruntal, however, acquired "no rights or interest in or to the name 'Philips, Appel & Walden.'" *Id.*

Also by the Asset Purchase Agreement, Gruntal acquired "any and all security and other deposits with respect to the [l]ease for the [Fort Lee] Office, ... and all other assets and properties of every kind and description and wherever located, relating to the conduct of the retail brokerage business at the [Fort Lee] Office." *Id.,* ¶ 1(c).

Pursuant to the Asset Purchase Agreement, Gruntal "[did] not assume any liabilities or obligations of [Philips] of any kind or nature whatsoever, except those liabilities and obligations commencing as of [19 April 1988, the closing date of the Asset Purchase Agreement (the "Closing Date") ] under the [l]ease [for the Fort Lee Office]." *Id.,* ¶ 2. Philips remains responsible for "all obligations, claims, demands, causes of action, proceedings, losses, damages, expenses, liabilities, fines, penalties, deficiencies and costs

... existing on the Closing Date or arising as a result of or in connection with the business or activities of [Philips] at the [Fort Lee] Office prior to the Closing Date." *Id.*

Gruntal, on the other hand, is liable only for claims "insofar as such [c]laim arises out of or relates to (i) the conduct of [Gruntal's] business or operations at the [Fort Lee] Office after the Closing Date, or (ii) the inaccuracy of any representation or the breach of any warranty, covenant or agreement of [Gruntal] contained in [the Asset Purchase Agreement]." *Id.,* ¶ 11(b).

Howard Silverman ("Silverman"), Gruntal's chairman and chief executive officer when the Asset Purchase Agreement was negotiated, testified at trial that Gruntal and Philips intended this limitation of liability to extend beyond tort liability to any obligations arising out of Philips' operations. Tr. at 17. Silverman explained: "This is a very litigious business and we certainly do not want any liabilities that we had no control over or we had no hands in creating." *Id.* Silverman testified Gruntal's intentions in this regard were made clear to Philips "from the first minute of our conversations [regarding the Asset Purchase Agreement] until the signing of th[e] document." *Id.* at 18.

The Asset Purchase Agreement also provided for the "carrying and clearing of certain customer accounts." Asset Purchase Agreement, ¶ 8(b). The provision states, in relevant part:

> For a period of 90 days after the Closing Date, [Philips] will use its best efforts to cause the retail brokerage customers of those registered representatives at the [Fort Lee] Office who accept employment with [Gruntal] *to transfer their accounts to [Gruntal] as of the Closing Date,* and [Philips] and [Gruntal] shall cooperate to facilitate the transfer of such accounts to [Gruntal]. [Gruntal] shall have the right, to be exercised at any time or from time to time but not later than 5 business days after the conversion of customer accounts of the [Fort Lee] Office ..., to reject any and all accounts of customers serviced at the [Fort Lee] Office which as of the Clos-

---

**5.** No further facts are alleged as to the citizen- ship or operations of Philips.

ing Date ... (i) have an unsecured or partially secured debit balance, or (ii) are ... not acceptable to [Gruntal], in its sole discretion. [Philips] shall arrange for the carrying and clearing of such rejected accounts, and shall remain responsible therefor. Anything herein contained to the contrary notwithstanding, ... [Philips] shall retain all rights to any income earned and shall remain responsible for all costs incurred ... as a result of trades executed or insurance policies sold on or prior to the Closing Date....

*Id.* (emphasis added).

Under the Asset Purchase Agreement, Philips

constitutes and appoints [Gruntal] ... as the true and lawful attorneys of [Philips], with full power of substitution, in its name, but on behalf of and for the benefit of [Gruntal] ... for those customer accounts which are transferred to [Gruntal] and retained by [Gruntal] pursuant to Section 8 hereof....

*Id.,* ¶ 14(a). Moreover, effective as of the Closing Date, [Gruntal] had the right to "receive and open all mail, packages and other communications addressed to [Philips] and relating to the retail brokerage business of the [Fort Lee] Office...." *Id.,* ¶ 14(b).

The Asset Purchase Agreement further provided, as a condition precedent to Gruntal's obligation to close, that Gruntal, Philips and Broadcort Capital Corp. ("Broadcort"), a company which performed clearance[6] functions for Philips, would enter into an letter agreement annexed to the Asset Purchase Agreement. *Id.,* ¶ 7(f).

The Asset Purchase Agreement is "governed by and construed in accordance with the laws of the State of New York applicable to contracts performed wholly within such state, except to the extent (if any) such laws may be superseded by Federal laws." *Id.,* ¶ 15(g).

On 19 April 1988, pursuant to the Asset Purchase Agreement, Gruntal, Broadcort and Philips entered into a letter agreement regarding continuation of Broadcort's clearance functions for Gruntal (the "Clearance Agreement"). Pursuant to the Clearance Agreement, Broadcort agreed to carry until 13 May 1988 those customer accounts which were transferred to Gruntal by Philips pursuant to the Asset Purchase Agreement. *See* Clearance Agreement, introduced by Gruntal as Exhibit P6, ¶ 1. The Clearance Agreement further provided that, "[e]ffective solely with respect to trades executed after the Closing [Date]," Gruntal agreed to "accept all of the duties, liabilities and obligations" of Philips arising out of its clearance arrangement with Broadcort. *Id.,* ¶ 2.

*The Steinbergs' Accounts*

As indicated, beginning in 1982, the Steinbergs maintained two separate securities trading accounts with Philips through its Fort Lee Office. Rappaport SJ Cert., ¶ 2. These accounts were identified by the numbers 39818442 ("Account 18442") and 39822321 ("Account 22321") (collectively, the "Steinberg Accounts"). Tr. at 71, 92. The Steinberg Accounts were each secured and governed by a "Standard Option Agreement" between the Steinbergs and Philips (collectively, the "Philips Contracts"). The Philips Contracts provide that "all controversies arising out of ... transactions [involving the Steinberg Accounts] shall be settled by arbitration within the City of New York before the New York Stock Exchange or the National Association of Securities Dealers." *See* Philips Contracts, submitted by Gruntal as Exhibits P1 and P2, ¶ 9.

As stated, the Steinbergs initiated the Arbitration Proceedings by submitting two statements of claim (the "Statements of Claim") to the NASD in April and May 1993. The Arbitration Proceedings arose out of the alleged failures of two Philips customer representatives to follow the instructions of the Steinbergs. *See* Tr. at 69–70. In the Statements of Claim, the Steinbergs made reference to Account 18442 and transactions carried out in that account; they did not make reference to transactions carried out in Account 22321. *See id.* at 71–72; *see also*

---

6. "Clearance is the function of doing the bookkeeping [and] record keeping of customer' transactions [and] customer funds." Tr. at 49.

Statements of Claim, attached to Complaint as Exhibit B. The Statements of Claim relate to acts and omissions made by Philips' customer representatives between 18 October 1987 and 15 February 1988. *See* Statements of Claim.

### The Prior Arbitration Proceedings

The Arbitration Proceedings which are the subject of the instant action are not the first instance of arbitration between the Steinbergs and Gruntal. In or about December 1989, Gruntal was named as a defendant in an NASD arbitration proceeding originally filed by the Steinbergs against Philips, bearing the number 88–02248 (the "Prior Arbitration Proceedings"). Nathan Cert., Ex. B. In the Prior Arbitration Proceedings, the Steinbergs complained that Philips improperly failed to execute a sell order, damaging the Steinbergs in the amount of $4,875.00. Steinberg SJ Response, Ex. A.

Upon being served by the NASD with notice of the Prior Arbitration Proceedings, Gruntal informed the NASD that it was not a proper party to the proceedings because it was not party to an agreement to arbitrate with the Steinbergs. *See* Nathan Cert., ¶¶ 5, 7. Gruntal also informed the NASD that it assumed no liabilities of Philips which arose prior to the Closing Date. *Id.*

The NASD did not respond to Gruntal's objections and the Prior Arbitration Proceedings went forward. The Prior Arbitration Proceedings were carried out in accordance with the rules for "Simplified Arbitration," provided in section 13 of the NASD Code of Arbitration Procedure.[7] Steinberg SJ Response, Ex. A at 1. As such, Gruntal "was not afforded the opportunity to present witnesses in support of its defense ... [or] to present oral argument." Nathan Cert., ¶ 8.

By Notice of Arbitration Award, dated 11 June 1990 (the "Prior Arbitration Award"), Gruntal was held liable to the Steinbergs, "as successor to Philips," in the amount of $4,875. Prior Arbitration Award, submitted

by the Steinbergs as Exhibit D6, at 2. When the Steinbergs attempted to have the Prior Arbitration Award confirmed in Maryland state court, their complaint was dismissed for lack of jurisdiction. Nathan Cert., Ex. F. As such, it appears the Prior Arbitration Award was never judicially confirmed. *Id.;* Steinberg SJ Reply Brief at 5.

### Discussion

As indicated, Gruntal seeks a declaration that it is not obligated to appear in the Arbitration Proceedings and a permanent injunction enjoining the Steinbergs from pursuing the Arbitration Proceedings. *See* Complaint, ¶¶ 21, 26.

■ The standard for the grant of a permanent injunction is substantially similar to that applied in reviewing requests for preliminary injunctions. The Circuit has established that, to prevail on its application for a preliminary injunction, the moving party must show:

> (1) the probability of irreparable injury to the moving party in the absence of relief; (2) the [absence of] a possibility of harm to the non-moving party if relief were granted; (3) the likelihood of success on the merits; and (4) the public interest [in granting preliminary relief].

*Alessi v. Pennsylvania, Dept. of Pub. Welfare,* 893 F.2d 1444, 1447 (3d Cir.1990); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir.1990); *Instant Air Freight Co. v. CF Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989); *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir. 1989); *Apollo Technologies Corp. v. Centrosphere Industrial Corp.,* 805 F.Supp. 1157, 1191 (D.N.J.1992); *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1118, 1132 (D.N.J.1991); *CPC Int'l, Inc. v. Caribe Food Distrib.,* 731 F.Supp. 660, 664 (D.N.J.1990);

---

7. Section 13 of the NASD Code of Arbitration Procedure provides, in relevant part: "Unless the public customer demands or consents to a hearing, or the arbitrator calls a hearing, the arbitrator shall decide the dispute, claim or controversy solely upon the pleadings and evidence filed by the parties." NASD Code of Arbitration Procedure § 13(f), *reprinted in* NASD Manual (CCH), ¶ 3713. Accordingly, under the NASD's procedure for "Simplified Arbitration," the NASD member does not have the right to call an arbitration hearing. *Id.*

*Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.,* 715 F.Supp. 616, 624 (D.N.J. 1989).

"The standard for permanent injunctive relief is the same, except that the moving party must show actual success instead of probable success on the merits." *Public Interest Research Group v. Star Enterprise,* 771 F.Supp. 655, 669 (D.N.J.1991); *see Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *Natural Resources Defense Council, Inc. v. Texaco, Inc.,* 906 F.2d 934, 941 (3d Cir.1990) ("[I]t is clear to us that a district court may issue a permanent injunction ... only after a showing both of irreparable injury and an inadequacy of legal remedies, and a balancing of the claims of injury and the public interest."); *see also CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 848 (3d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985).

Significantly, the Circuit has repeatedly stated that a "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988); *accord Chez Sez III Corp. v. Union,* 945 F.2d 628, 634 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Instant Air,* 882 F.2d at 800; *United States v. City of Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980); *see also Driscoll Potatoes, Inc. v. N.A. Produce Co.,* 765 F.Supp. 174, 176 (D.N.J.1991).

### 1. *Success on the Merits*

In order to succeed on the merits of its claim, Gruntal must establish first that it is entitled to a declaration of its rights with respect to the Arbitration Proceedings and second that it is not, in fact, bound to arbitrate with the Steinbergs in the Arbitration Proceedings.

### a. *Declaratory Judgment*

■ Section 2201 of United States Code Title 28 [8] provides authority for district courts to issue declaratory judgments. Section 2201 does not grant jurisdiction; rather, it provides a mode of relief for aggrieved persons. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Liberty Mutual Insurance Co. v. Insurance Corp. of Ireland, Ltd.,* 693 F.Supp. 340 (W.D.Pa.1988).

■ A declaratory judgment is inappropriate solely to adjudicate past conduct. *Crown Cork & Seal Co., Inc. v. Borden, Inc.,* 779 F.Supp. 33, 35 (E.D.Pa.1991). "The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Rhodes v. Stewart,* 488 U.S. 1, 4, 109 S.Ct. 202, 203, 102 L.Ed.2d 1 (1988) (quoting *Hewitt v. Helms,* 482 U.S. 755, 761, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987)) (emphasis in original).

■ To satisfy the case or controversy requirement,

an action must present "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned judicial resolution."

*Armstrong World Industries, Inc. v. Adams,* 961 F.2d 405, 410 (3d Cir.1992) (quoting *International Bhd. of Boilermakers v. Kelly,* 815 F.2d 912, 915 (3d Cir.1987)). The Third Circuit has further explained: "The fundamental test is whether the plaintiff seeks merely advice or whether a real question of

---

8. Section 2201 of title 28 provides, in pertinent part:
   In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
   28 U.S.C. § 2201(a).

conflicting legal interests is presented for judicial determination." *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1170 (3d Cir.1987); *see Global Leasing Inc. v. Henkel Corp.,* 744 F.Supp. 595, 597 (D.N.J. 1990).

■■■ If the declaratory judgment is sought to protect against a feared, future event, "the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Salvation Army v. Department of Community Affairs,* 919 F.2d 183, 192 (3d Cir.1990) (quoting *Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)). The determination of whether a particular controversy is sufficiently immediate and real must be made on a case by case basis. *Global Leasing Inc.,* 744 F.Supp. at 597.

■■■ Whether to grant relief pursuant to section 2201 is vested in the court's discretion. "Although the threat of legal action may present a real controversy, ... the remedy of a declaratory judgment is discretionary even where a justiciable controversy exists." *Zimmerman,* 834 F.2d at 1170; *see Step–Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643, 646–47 (3d Cir. 1990). A "[c]ourt should refuse to proceed if it finds that a declaratory judgment action will not serve a useful purpose or is otherwise undesirable.... [A c]ourt must ask whether the requested declaratory judgment will (1) clarify and settle legal relations in issue and (2) terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action." *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 216 (D.Del.1991).

■■■ Applying these principles to the facts at bar, Gruntal is entitled to a declaration its rights concerning arbitration in this matter. As indicated, the Arbitration Proceedings are currently pending before the NASD. More importantly, the issue of the arbitrability of the dispute is currently before the NASD arbitration panel. *See* Rappaport PI Cert., ¶ 6. There is, therefore, a concrete possibility that the NASD panel will compel Gruntal to arbitrate in the absence of a judicial determination as to arbitrability.

As the Third Circuit has stated, a party reluctant to arbitrate "has a right to a judicial determination of his obligation to arbitrate." *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 515 (3d Cir.1990); *see AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) ("[T]he question of arbitrability ... is undeniably an issue for judicial determination."); *PaineWebber, Inc. v. Hofmann,* 984 F.2d 1372 (3d Cir.1993) (same; holding plaintiff securities broker-dealer entitled to declaratory judgment as to obligation to arbitrate); *Morristown Daily Record v. Graphic Communications Union, Local 8N,* 832 F.2d 31, 33 (3d Cir.1987) ("Whether a dispute is arbitrable is a question for the court to resolve. Absent the parties' clear expression to the contrary, that threshold question is to be decided by the court, not the arbitrator." (citations omitted)); *Downing v. Merrill Lynch, Pierce, Fenner & Smith,* 725 F.2d 192, 195 (2d Cir. 1984) (plaintiff was "entitled to a declaratory judgement as to whether he had an agreement with [defendant] to arbitrate disputes...."). Gruntal's right to a judicial determination as to the arbitrability of this matter is placed in real and immediate danger by the Arbitration Proceedings.

Under these facts, Gruntal has presented an actual legal controversy which affects it in a concrete manner. *See Armstrong,* 961 F.2d at 410. The threat to Gruntal posed by the pending Arbitration Proceedings is of sufficient immediacy and reality to warrant judicial resolution at this time. *See Salvation Army,* 919 F.2d at 192. Accordingly, Gruntal is entitled to a judicial declaration of its rights regarding arbitration.

b. *Gruntal's Obligation to Arbitrate in the Arbitration Proceedings*

■■■ The central issue with respect to Gruntal's success on the merits is, of course, the existence *vel non* of an obligation on the part of Gruntal to arbitrate in the Arbitration Proceedings. Arbitrability disputes connected with a transaction involving interstate commerce are governed by the Federal Arbi-

**334**

tration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA"). *Hartmann,* 921 F.2d at 510; *see Moses H. Cone Memorial Hospital v. Mercury Construction Corp,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("Federal law in the terms of the [FAA] governs [the issue of arbitrability] in either state or [F]ederal court."). The transactions at issue in the Arbitration Proceedings were carried out by telephone between the Steinbergs, residents of Maryland, and the Fort Lee Office, located in New Jersey. *See* Statements of Claim. Because the instant dispute is connected with transactions involving interstate commerce, the issue of arbitrability is governed by the FAA. *See Hartmann,* 921 F.2d at 510.

■ "In enacting [the FAA], Congress declared a strong national policy favoring arbitration...." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). "The [FAA] establishes that, as a matter of [F]ederal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Memorial Hospital,* 460 U.S. at 24-25, 103 S.Ct. at 941.

Notwithstanding this policy favoring arbitration, "the FAA does not require parties to arbitrate when they have not agreed to do so...." *Volt Information Sciences v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989). As the Supreme Court has stated: "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration [in] any dispute which he has not agreed so to submit." *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *see Hofmann,* 984 F.2d at 1381 ("[A]rbitration is a matter of contract, so no party should be forced to arbitrate a claim it never agreed to submit to arbitration."); *Morristown Daily Record,* 832 F.2d at 33 ("[T]he arbitrators derive their authority from the parties' voluntary agreement.").

■ "Before compelling an unwilling party to arbitrate, [the FAA] requires the court to engage in a limited review to ensure that the dispute is arbitrable—i.e., *that a valid agreement to arbitrate exists between the parties* and that the specific dispute falls within the substantive scope of that agreement.... If a court determines that a valid arbitration agreement does not exist ... it is obliged to enjoin arbitration." *Hartmann,* 921 F.2d at 511 (emphasis supplied).

■ Because arbitration is a matter of contract, the existence *vel non* of a valid agreement to arbitrate will be governed by state law principles governing contracts generally. *See Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional de Venezuela,* 991 F.2d 42, 45-46 (2d Cir.1993) ("[W]e apply state law in determining whether the parties have agreed to arbitrate."); *Wren Distributors, Inc. v. Phone–Mate, Inc.,* 600 F.Supp. 1576, 1580 (E.D.N.Y.1985) (same). As the Supreme Court has stated:

An agreement to arbitrate is valid, irrevocable and enforceable, as a matter of [F]ederal law, "save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added [in original text] ). Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.

*Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987) (emphasis in original). Thus, the FAA, while creating Federal substantive law regarding the enforceability of arbitration agreements, "preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." *Progressive Casualty Insurance Co.,* 991 F.2d at 46; *see also Volt Information Sciences,* 489 U.S. at 475, 109 S.Ct. at 1254 ("[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [FAA], due regard must be given to the [F]ederal policy favoring arbitration...." (citation omitted)).

The Steinbergs do not argue that they and Gruntal are signatories to a contract to arbitrate. Ronald Steinberg, in fact, testified at trial that he never signed an agreement of any sort with Gruntal. Tr. at 79. Instead,

the Steinbergs rely on two alternative bases for Gruntal's asserted obligation to arbitrate in the Arbitration Proceedings: (1) the transfer of the Steinberg Accounts, and the arbitration clauses in the accompanying Philips Contracts, to Gruntal as a result of the Asset Purchase Agreement and (2) Gruntal's membership in the NASD.

### (i) *Transfer of Steinberg Accounts and Philips Contracts to Gruntal*

Significant doubt exists as to whether the Steinberg Accounts and the attendant Philips Contracts were ever transferred to Gruntal pursuant to the transfer provision in the Asset Purchase Agreement. The testimony and documentary evidence adduced at trial indicated, at a minimum, that Account 18442, the subject of the Arbitration Proceedings, was never transferred to Gruntal. *See, e.g.,* Tr. at 125. It is not necessary, however, to conclusively decide this issue here. Even if the Steinberg Accounts and Philips Contracts were transferred to Gruntal, such a transfer cannot, by itself, create an obligation to arbitrate on Gruntal's part.

■ "Under New York law, made applicable by [the Asset Purchase Agreement], the assignee of rights under a bilateral contract is not bound to perform the assignor's duties unless he expressly assumes to do so." *Lachmar v. Trunkline LNG Co.,* 753 F.2d 8, 9–10 (2d Cir.1985); *see 805 Third Avenue Co. v. Excel Marketing Enterprises Corp.,* 1987 WL 12822 at *3 (S.D.N.Y. 18 June 1987), *aff'd,* 847 F.2d 834 (2d Cir.1988); *United States v. Panhandle Eastern Corp.,* 672 F.Supp. 149, 154 (D.Del.1987); *Sillman v. Twentieth Century–Fox Film Corp.,* 3 N.Y.2d 395, 402, 165 N.Y.S.2d 498, 144 N.E.2d 387 (1957); *Kagan v. K–Tel Entertainment, Inc.,* 172 A.D.2d 375, 377, 568 N.Y.S.2d 756 (App.Div. 1st Dept.1991). "Included among the duties to which this rule has reference is the duty to arbitrate." *Lachmar,* 753 F.2d at 10;[9] *see Panhandle Eastern Corp.,* 672 F.Supp. at 154; *Matter of Kaufman,* 272 A.D. 578, 581–82, 74 N.Y.S.2d 23 (App.Div. 1st Dept.1947); *see also In re Application of Calvin Klein Co.,* 88 A.D.2d 503, 504, 449 N.Y.S.2d 729 (App.Div. 1st Dept.1982) ("In the absence of a specific agreement to arbitrate, the guarantors of a principal agreement containing an arbitration clause cannot be compelled to arbitrate. Parties to a commercial transaction will not be held to have chosen arbitration as a forum for resolution of their disputes in the absence of an express, unequivocal agreement to that effect.").[10]

■ In the instant case, the record establishes conclusively that Gruntal never expressly assumed Philips' duty to arbitrate in the Arbitration Proceedings. As indicated, the Arbitration Proceedings involve transactions and events which took place on or before 15 February 1988, over two months prior to the Closing Date. *See* Statements of Claim. Also as indicated, Gruntal, by the Asset Purchase Agreement, expressly renounced any obligations of Philips, to arbitrate or otherwise, "arising as a result of or in connection with the business or activities of [Philips] at the [Fort Lee] Office prior to the Closing Date." Asset Purchase Agree-

---

**9.** In *Lachmar,* the Second Circuit found no obligation to arbitrate on the part of the assignee where the assignment contract provided that it "d[id] not impose on the [assignee] any obligations or liabilities with respect to the [assigned contract]." 753 F.2d at 9.

**10.** In *Banque de Paris et de Pays–Bas v. Amoco Oil Co.,* 573 F.Supp. 1464 (S.D.N.Y.1983) (*"Paribas"*), the court held an assignee was obligated to arbitrate pursuant to the arbitration clause in the assigned contract. The court stated: "Normally, the assignee is bound to arbitrate all disputes, if that is the remedial mechanism agreed upon by the assignor." *Id.* at 1466.

"Nevertheless," the court continued, "the assignee ... may be able to establish that it has refused to agree to arbitrate subsequent claims by giving proper notice of the limited nature of its involvement...." *Id.* "In *Paribas,* therefore, the court reached its holding because the assignee failed to secure any agreement concerning the scope of its involvement in the underlying contract." *Panhandle Eastern Corp.,* 672 F.Supp. at 154. In the instant case, by contrast, Gruntal made clear in the Asset Purchase Agreement the limited nature of its involvement with Philips' customers. *See* Asset Purchase Agreement, ¶ 2. Accordingly, the reasoning of the decision in *Paribas* is inapposite to the facts at bar. *See Panhandle Eastern Corp.,* 672 F.Supp. at 154 (rejecting *Paribas* and following *Lachmar,* 753 F.2d at 9–10, on identical grounds).

ment, ¶ 2. Silverman, the Gruntal officer who negotiated the Asset Purchase Agreement with Philips, testified at Trial that Gruntal had no intention of assuming *any* responsibilities of Philips which arose prior to the Closing Date. *See* Tr. at 17. Silverman also testified this provision was an integral condition of Gruntal's assent to the Asset Purchase Agreement, a fact of which Philips was aware from the first day of negotiations. *Id.* at 18.

Faced with this evidence, the Steinbergs have come forward with nothing to indicate Gruntal expressly assumed the obligation to arbitrate contained in the Philips Contracts. Because the Arbitration Proceedings relate to claims arising prior to the Closing Date, Gruntal did not expressly assume any obligations under the Philips Contracts to arbitrate in the Arbitration Proceedings. Under New York law, which governs the existence of an arbitration agreement in this case, the transfer of the Steinberg Accounts and the Philips Contracts to Gruntal could not create an obligation on the part of Gruntal to arbitrate in the Arbitration Proceedings. *See Lachmar,* 753 F.2d at 9–10.

The Steinbergs also argue that this court is bound by the doctrine of issue preclusion to find that Gruntal is the successor to Philips' obligation to arbitrate under the Philips Contracts. Tr. at 145. To this end, the Steinbergs point to the Prior Arbitration Award, which held Gruntal liable "as successor to Philips...." Prior Arbitration Award; *see* Tr. at 145.

■■■■ The doctrine of issue preclusion [11] "embodies the principle that 'later courts should honor the first actual decision of a matter that has actually been heard and litigated.' " *Rider v. Pennsylvania,* 850 F.2d 982, 989 (3d Cir.) (quoting C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416 at 136 (1981)), *cert. denied,* 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 582

(1988). "By precluding a court from making a second determination as to an issue on which an earlier court has previously rendered a decision, the doctrine of issue preclusion assists in the 'maintenance of the social order' and 'secure[s] the peace and repose of society by the settlement of matters capable of judicial determination.' " *Id.* (quoting *Southern Pacific Railroad v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)).

■■■■ Issue preclusion "precludes the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted." *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986) (citing *New Jersey–Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education,* 654 F.2d 868, 876 (3d Cir.1981)); *State v. Gonzalez,* 75 N.J. 181, 380 A.2d 1128 (1977). Issue preclusion does not extend to collateral issues nor to matters inferred from the judgment. *Id.* The doctrine of issue preclusion may be invoked where:

(1) the identical issue was decided in a prior adjudication;

(2) there was a final judgment on the merits;

(3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and

(4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question [in the prior matter].

*Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 505 (3d Cir.1992) (citing *Temple University v. White,* 941 F.2d 201, 212 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992)); *see Gregory,* 843 F.2d at 121. The issue must have

---

11. "To reduce the confusion that resulted from the interchangeable use of [the terms, *res judicata* and collateral estoppel], the courts have refined the nomenclature used in the preclusion doctrine." *Gregory v. Chehi,* 843 F.2d 111, 115 (3d Cir.1988) (citing *Wade v. City of Pittsburgh,* 765 F.2d 405, 408 (3d Cir.1985)). The term 'issue preclusion' has in modern par-

lance replaced collateral estoppel. *See Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 189 (3d Cir.1993); *Electro–Miniatures Corp. v. Wendon Co.,* 889 F.2d 41, 44 (3d Cir.1989); *Gregory,* 843 F.2d at 115–116; *Pittman v. LaFontaine,* 756 F.Supp. 834, 841 (D.N.J.1991).

been " 'distinctly put in issue' and 'directly determined' adversely to the party against which the estoppel is asserted." *New Jersey–Philadelphia Presbytery,* 654 F.2d at 876 (quoting *City of Plainfield v. Public Service Electric and Gas,* 82 N.J. 245, 257–58, 412 A.2d 759 (1980)).

The party asserting issue preclusion "bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1321 (9th Cir.1992); *see Connors v. Tanoma Mining Co., Inc.,* 953 F.2d 682, 684 (D.C.Cir.1992); *McLendon v. Continental Group, Inc.,* 660 F.Supp. 1553, 1560 (D.N.J.1987); *see also Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990) (applying burdens similarly in criminal case). In order to carry this burden,

> [i]t is not enough that the party introduce the decision of the prior court; rather, the party must introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated.

*Clark,* 966 F.2d at 1321. "Reasonable doubts as to what was decided by a prior judgment should be resolved against using it as an estoppel." *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.1970); *see Gregory,* 843 F.2d at 121; *Republic of Philippines v. Westinghouse Corp.,* 782 F.Supp. 972, 981 (D.N.J. 1992).

"It is well-settled that the doctrine of [issue preclusion] is applicable to issues resolved by [an] earlier arbitration." *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991); *see Clark,* 966 F.2d at 1321; *Universal American Barge Corp. v. J–Chem, Inc.,* 946 F.2d 1131, 1137 (5th Cir.1991). However, a "valid and final" arbitration award will have issue preclusive effect "only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including [*inter alia* ] [t]he right on behalf of a party to present evidence and legal argument in support of that party's contention and fair opportunity to rebut evidence and argument by opposing parties." *Nogue v. Estate of Santiago,* 224 N.J.Super. 383, 387, 540 A.2d 889 (App.Div.1988) (quoting Restatement of Judgments (Second), § 83); *see Universal American Barge Corp.,* 946 F.2d at 1137; *see also Centra,* 983 F.2d at 505 (party against whom issue preclusion is asserted must have had full and fair opportunity to litigate in prior proceeding).

In reviewing an arbitral award for issue preclusive effect, it must be kept in mind that arbitration panels are not courts of law and that arbitral procedures often vary significantly from judicial procedures. *See Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352, 1361 (11th Cir.1985); *see also* NASD Code of Arbitration Procedure § 13 (providing for "Simplified Arbitration"). "[A]rbitral findings typically lack the supervisory scrutiny of authoritative review, giving rise to the argument that arbitration risks determinations based on irrelevant or hearsay evidence, or the personal whims of arbitral panel members." *Universal American Barge Corp.,* 946 F.2d at 1137. Accordingly, courts must be cautious of procedural variances between arbitral proceedings and judicial proceedings when deciding whether to give preclusive effect to the former. *See id.; Greenblatt,* 763 F.2d at 1360; *see also General Committee of Adjustment, United Transportation, Western Maryland R. Co. v. CSX Railroad Corp.,* 893 F.2d 584, 593 (3d Cir. 1990).

Absent judicial confirmation, an arbitration award will not result in a "final judgment" and cannot, therefore, have preclusive effect on subsequent litigation.[12] *See Centra,* 983 F.2d at 505. Courts have accordingly refused to give unconfirmed arbitration awards issue preclusive effect in subsequent litigation. *See Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 385 (2d Cir.1989) ("[I]t is the *judgment* entered on an arbitration award that is given preclusive effect in subsequent litigation. An arbitration award that is not filed and confirmed in an appro-

---

12. The law of Maryland, where the Prior Arbitration Proceedings took place, provides that a judgment in an arbitration proceeding shall issue "[i]f an order, confirming, modifying or correcting an award is granted...." Md.Code Anno. § 3–228. Such "judgment may be enforced as any other judgment." *Id.*

338

priate court is without effect." (emphasis in original)); *Scott v. Snelling and Snelling, Inc,* 732 F.Supp. 1034, 1039 (N.D.Cal.1990) ("Here, the award of the arbitrator ... has apparently not been confirmed by either a [F]ederal or state court. Hence, it does not constitute a final judgment for [issue preclusion] purposes."); *see also CSX Railroad, Corp.,* 893 F.2d at 593 (refusing to give arbitration award issue preclusive effect in part because "a petition to review the ... arbitration decision is still pending in a [F]ederal district court"); *Singer Co. v. Tappan Co.,* 593 F.2d 545, 549 (3d Cir.1979) ("The final judgment confirming the award therefore properly forecloses future litigation....").

■ Applying these principles to the facts at bar, the Steinbergs' issue preclusion argument fails on three separate grounds. First, it cannot be determined from the record whether the issue at bar was "distinctly put in issue and directly determined" in the Prior Arbitration Proceedings. *New Jersey–Philadelphia Presbytery,* 654 F.2d at 876. The Prior Arbitration Award states Gruntal is *liable* as successor to Philips. *See* Prior Arbitration Award at 2. There is no determination as to whether Gruntal is *bound to arbitrate* as successor to Philips. There is no discussion or authority indicating the arbitration panel even considered the issue of arbitrability. Indeed, the arbitrability of the dispute at issue in the Prior Arbitration Proceedings and the existence of an arbitration agreement between Gruntal and the Steinbergs are not even addressed in the Prior Arbitration Award. *See id.*

In the instant proceedings, on the other hand, the sole issue to be determined is the arbitrability of the dispute and the existence *vel non* of an agreement to arbitrate between the Steinbergs and Gruntal. The liability of Gruntal to the Steinbergs, apparently the sole issue before the panel in the Prior Arbitration Proceedings, is irrelevant to this inquiry. The Steinbergs have submitted nothing to indicate the specific issue here at bar was "distinctly put in issue and directly decided" in the Prior Arbitration Proceedings. Absent some evidence to this effect, the Prior Arbitration Award cannot be accorded pre-

clusive effect over the instant inquiry. *See Gregory,* 843 F.2d at 121.

Second, it does not appear Gruntal was afforded a "full and fair opportunity to litigate" the issue of arbitrability in the Prior Arbitration Proceedings. *Centra,* 983 F.2d at 505. As indicated, the Prior Arbitration Proceedings were carried out pursuant to the NASD's "Simplified Arbitration" procedure. *See* Prior Arbitration Award at 1. Under this procedure, Gruntal was not permitted to request a hearing or to present witnesses. *See* NASD Code of Arbitration Procedure § 13(f), *reprinted in* NASD Manual (CCH), ¶ 3713; *see also* Nathan Cert., ¶ 8. In this respect, the Prior Arbitration Proceedings were at substantial variance with a judicial proceeding. *See Nogue,* 224 N.J.Super. at 387, 540 A.2d 889 (arbitration award only has preclusive effect if proceeding underlying award "entailed the essential elements of adjudication, including ... [t]he right ... to present evidence and legal argument...."). Thus, even if the issue of arbitrability were placed in issue in the Prior Arbitration Proceedings, which it was not, Gruntal did not have a full and fair opportunity to litigate that issue. Under these circumstances, giving the Prior Arbitration Award issue-preclusive effect in these proceedings would be inappropriate. *See Centra,* 983 F.2d at 505.

Finally, the Prior Arbitration Award was never judicially confirmed. *See* Nathan Cert., Ex. F. As indicated, "it is the *judgment* entered on an arbitration award that is given preclusive effect in subsequent litigation. An arbitration award that is not filed and confirmed in an appropriate court is without effect." *Leddy,* 875 F.2d at 385 (emphasis in original). Absent such judicial confirmation, the Prior Arbitration Award has no preclusive effect here. *Id.; see Centra,* 983 F.2d at 505 (issue preclusion requires final judgment).

As well, in the absence of judicial confirmation, granting the Prior Arbitration Award preclusive effect over the issue of arbitrability would deprive Gruntal of its well-established "right to a judicial determination of [its] obligation to arbitrate." *Hartmann,* 921 F.2d at 515. More specifically, if Gruntal is deemed obligated to arbitrate on the force of

the unconfirmed Prior Arbitration Award alone, it is the NASD which has determined the arbitrability of this dispute, and not a court of law. As the Supreme Court has stated: "[T]he question of arbitrability ... is undeniably an issue for judicial determination." *AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1418.

The record establishes that Gruntal is not bound to arbitrate as successor to or assignee of Philips' obligations under the Philips Contracts. The doctrine of issue preclusion cannot be used in this case to alter this conclusion. Accordingly, the Steinbergs' argument that Gruntal is bound under a successor/assignee theory to arbitrate in the Arbitration Proceedings must fail.

(ii) *The NASD Code of Arbitration Procedure*

As stated, the Steinbergs cite the NASD Code of Arbitration Procedure as a second basis for Gruntal's obligation to arbitrate. *See* Steinberg Trial Brief at 1. The possibility that Gruntal would be obligated to arbitrate by virtue of the NASD Code of Arbitration Procedure was addressed and disposed of in *Gruntal I. See* 837 F.Supp. at 92. While the parties have submitted no argument which warrants the revisitation of that holding here, the issue will be discussed again briefly.

■ It is recognized that the rules and regulations of self regulatory organizations such as the NASD "are sufficient in and of themselves to compel arbitration of *covered disputes* ..., whether or not they are incorporated in a purchase or sale agreement." *Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.,* 728 F.2d 577, 580 (2d Cir.1984) (emphasis added) (addressing arbitration rules of New York Stock Exchange); *see Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc.,* 819 F.2d 400, 406 (3d Cir.1987) (Customer of broker-dealer "can demand arbitration of its disputes with [broker-dealer] by virtue of § 12(a) [of the NASD Code of Arbitration Procedure], and [broker dealer] is compelled to submit even absent a specific contractual arbitration undertaking directly with [customer]."); *Scobee Combs Funeral Home, Inc.*

*v. E.F. Hutton & Co.,* 711 F.Supp. 605, 608 (S.D.Fla.1989) (same). Even so, in order for Gruntal's NASD membership to provide a basis to compel arbitration here, the instant dispute must be covered by the NASD Code of Arbitration Procedure. *See Paine, Webber,* 728 F.2d at 580.

The NASD Code of Arbitration Procedure states in relevant part:

> Sec. 1. This Code of Arbitration Procedure is prescribed and adopted ... for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the [NASD]
>
> ....
>
> (2) between or among members and public customers, or others....

> Sec. 12(a) Any dispute, claim or controversy eligible for submission under Part I of this Code between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this code....

NASD Code of Arbitration Procedure, *reprinted in* NASD Manual (CCH) 3711, 3713.

■ It has been recognized that "these sections contain two prerequisites before an NASD member can be compelled to arbitrate. First, a complaining party must be a 'customer' of the NASD member, and second, the 'dispute, claim or controversy' must have arisen 'in connection with the business of such member.'" *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814, 820 (11th Cir. 1993); *cf. Patten Securities,* 819 F.2d at 406 (NASD Code of Arbitration Procedure § 12(a) provided basis for arbitration because claimant was "customer" of broker dealer).

These requirements were addressed under facts similar to those at bar in *Wheat,* 993 F.2d 814. There, the plaintiff, a broker-dealer with membership in the NASD, filed an action for a declaratory judgment that it was not obligated to arbitrate with the defendants before the NASD. The defendants were investors who held accounts with a securities brokerage firm known as Marshall

Securities ("Marshall") from 1984 through 1989. *See id.* at 815.

In January of 1990, the defendants brought arbitration proceedings against the plaintiff and Marshall before the NASD. The defendants alleged that Marshall, through one of its employee broker-dealers, made certain material misrepresentations to the defendants in connection with purchases of certain stock. *See id.*

"Well after the allegedly fraudulent ... stock transactions occurred," the plaintiffs entered into an "Asset Purchase Agreement" with Marshall. *Id.* at 816. Under that asset purchase agreement, the plaintiffs "expressly did not 'assume any liability, known or unknown, fixed or contingent, of [Marshal], except for [Marshall's] liabilities and obligations under the Contracts' that were specified in an exhibit to the agreement." *Id.* The defendants' customer agreements with Marshall were not included among these "Contracts." *Id.*

The district court granted the plaintiff's request for declaratory relief, holding that the plaintiff was not obligated to arbitrate any claims arising out of trading the defendants conducted through their accounts with Marshall. *Id.* The Eleventh Circuit affirmed.

In so holding, the Eleventh Circuit rejected the defendants' argument that the plaintiff's membership in the NASD compelled it to arbitrate with the defendants. The court first noted the dual prerequisites of arbitrability under the NASD Code of Arbitration Procedure: (1) that the complaining party be "customer" of the NASD member; and (2) that the dispute arose "in connection with the business" of the member. *Id.* at 820; *cf. Patten Securities*, 819 F.2d at 406 (NASD Code of Arbitration Procedure § 12(a) provided basis for arbitration because claimant was "customer" of broker dealer).

Applying the first of these prerequisites, the court held that the defendants were not customers of the plaintiffs for the purposes of the NASD Code of Arbitration Procedure. The court applied the rule that "customer status for the purposes of NASD Code [of Arbitration Procedure] §§ 1 and 12(a) must be determined as of the time of the events providing the basis for the allegations of fraud." *Wheat*, 993 F.2d at 820; *cf. Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503 (3d Cir.1994) ("[M]embership [in a stock exchange] which is material [for the purposes of the exchange's arbitration code] is membership at the time the events giving rise to the controversy occur."). The court explained: "[w]e cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member...." *Wheat*, 993 F.2d at 820. The court found, on this basis, that the plaintiff's membership in the NASD did not compel it to arbitrate with the defendants.[13] *Id.*

Applying these principles to the facts at bar, it appears that where the Arbitration Proceedings are concerned, the Steinbergs are not 'customers' of Gruntal for the purposes of the NASD Code of Arbitration Procedure. Like the acts of fraud involved in *Wheat*, the misconduct which is the subject of the Arbitration Proceedings took place, in its entirety, at least two months before the Steinbergs became customers of Gruntal. *See* Statements of Claim. Because these acts were committed when the Steinbergs were not customers of Gruntal, Gruntal cannot be compelled to arbitrate with the Steinbergs by virtue of the NASD Code of Arbitration Procedure. *See Wheat*, 993 F.2d at 820.

The claims at issue in the Arbitration Proceedings, moreover, did not arise "in connection with the business of" Gruntal, as is required by the NASD Code of Arbitration Procedure. *Wheat*, 993 F.2d at 820. As indicated, the Arbitration Proceedings relate to acts and omissions occurring over two

---

13. In *Wheat,* the Eleventh Circuit addressed the issue of 'customer' status under the NASD Code of Arbitration Procedure separately from the issue of successor liability. *See* 993 F.2d at 820–21. Therefore, 'customer' status is to be determined "at the time of the events providing the basis for the allegations of fraud," notwithstanding successor relationships. *See id.* As indicated, Gruntal cannot be obligated to arbitrate in the Arbitration Proceedings under a successor-in-interest theory. *See supra* at 335–336.

months before Gruntal had any relationship with the Steinbergs. *See* Statements of Claim. The Steinbergs have submitted no evidence to indicate the acts and omissions at issue in the Arbitration Proceedings involved Gruntal's business. Under these circumstances, the Steinbergs have failed to establish the second requirement of arbitrability under the NASD Code of Arbitration Procedure. *See Wheat,* 993 F.2d at 820.

The record establishes that Gruntal is not bound to arbitrate with the Steinbergs in the Arbitration Proceedings by virtue of the NASD Code of Arbitration Procedure. Because Gruntal and the Steinbergs are not parties to a valid agreement to arbitrate, Gruntal may not be compelled to appear in the Arbitration Proceedings. *See Hartmann,* 921 F.2d at 511. Gruntal has, therefore, established success on the merits of its claim.

### 2. *Irreparable Harm*

■ In order to demonstrate irreparable injury, the moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The ... injunction must be the *only* way of protecting the plaintiff from harm." *Instant Air,* 882 F.2d at 801 (emphasis added) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 3569 & n. 9 (3d Cir.1980)).

The Supreme Court, in speaking to the irreparable injury requirement, has stated:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not constitute irreparable injury.... "The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray,* 415 U.S. 61, 90, 94, 94 S.Ct. 937, 952, 954, 39 L.Ed.2d 166 (1974) (emphasis original) (quoting *Virginia Petro-*

*leum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.D.C.1958); quoted in *Instant Air,* 882 F.2d at 801).

■ The Circuit has towed a similarly strict line on what constitutes irreparable injury. In *Frank's GMC,* the court stated that "[t]he availability of adequate monetary damages belies a claim of irreparable injury." 847 F.2d at 102; *accord Morton v. Beyer,* 822 F.2d 364, 372 (3d Cir.1987). In *Instant Air,* the court stated: "[W]e have never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law." 882 F.2d at 801 (quoting *In re Arthur Treacher's,* 689 F.2d 1137, 1145 (3rd Cir.1982); *see also Morton,* 822 F.2d at 372 (no injunction to prevent termination of plaintiff's employment despite fact that significant cash flow problems and financial distress could follow).

Finally, the Circuit has indicated that "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury." *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 205 (3d Cir.1990) (quoting *Ecri v. McGraw–Hill, Inc.,* 809 F.2d 223, 225 (3d Cir.1987)).

Extensive analysis of the irreparable injury requirement in this case is obviated by the Third Circuit's decision in *Hartmann,* 921 F.2d 507. In *Hartmann,* the plaintiff, a brokerage firm, moved for a preliminary injunction to prevent arbitration of a dispute involving the defendants, who were the plaintiff's clients. The issue of the arbitrability of the dispute was put before the arbitration panel. *See Id.* at 514. The district court granted the plaintiff's motion and preliminarily enjoined the arbitration proceedings. The Circuit affirmed.

Addressing the issue of irreparable harm, the Circuit stated:

> [W]e think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit

to an arbitrator's own determination of his authority.

*Id.* at 515.

Turning to the facts at bar, the issue of the arbitrability of the dispute between the Steinbergs and Gruntal is presently before the NASD arbitration panel. Rappaport PI Cert., ¶ 6. Gruntal has not agreed to allow the NASD panel to determine the issue of arbitrability. Indeed, Gruntal has not agreed to arbitration of any sort with respect to the claims raised in the Arbitration Proceedings. Compelling Gruntal to appear in the Arbitration Proceedings under these facts would constitute *per se* irreparable harm for the purposes of the injunction analysis. *See Hartmann,* 921 F.2d at 515.

### 3. *Balance of Hardships*

 In deciding whether injunctive relief is appropriate, the hardships to the respective parties must be balanced. *Opticians Ass'n,* 920 F.2d at 197; *Frank's GMC,* 847 F.2d at 102. The purpose behind this balancing is to ensure that the issuance of an injunction would not harm the defendant more than a denial would harm the plaintiff. *Opticians Ass'n,* 920 F.2d at 197; *Ecri,* 809 F.2d at 226.

In the instant case, the Steinbergs have offered no reason to infer that an injunction against arbitration would be unduly prejudicial to them. In enjoining arbitration, it is not held that Gruntal is not liable to the Steinbergs for the misconduct alleged in the Statements of Claim. It is merely held that these claims may not be resolved through arbitration because Gruntal has not agreed to such arbitration. A judicial remedy may still be available to the Steinbergs.

Gruntal, moreover, is not involved in the events at issue in the Arbitration Proceedings. *See* Statements of Claim. Gruntal will therefore have nothing to add to the Arbitration Proceedings by way of testimonial or documentary evidence. Also, Gruntal has expressly rejected all liability for Philips' actions as alleged in the Arbitration Proceedings. *See* Asset Purchase Agreement, ¶ 2. It appears, therefore, that any recovery by the Steinbergs in the Arbitration Proceedings would lie against Philips, and not against Gruntal. Under these circumstances, it does not appear the Steinbergs will be harmed by the enjoining of arbitration with respect to Gruntal.

### 5. *Public Interest*

The final consideration in determining whether injunctive relief is appropriate is whether the issuance of the injunction furthers the public interest. *See Texaco, Inc.,* 906 F.2d at 941. Neither party has argued, nor does it appear, that the public interest significantly affects the analysis in this case. Where the public interest has little to add to the other factors governing injunctive relief, it is not considered. *Hoxworth,* 903 F.2d at 208; *Instant Air,* 882 F.2d at 803.

### *Conclusion*

Gruntal has established its entitlement to declaratory and permanent injunctive relief against the Arbitration Proceedings. For the reasons stated, Gruntal is declared free from any obligation to arbitrate in the Arbitration Proceedings. The Steinbergs, accordingly, are permanently enjoined from pursuing the Arbitration Proceedings against Gruntal.