**Kevin MILLER, et al., Plaintiffs–Appellees,**

**v.**

**Dr. Charles W. FLUME, et al., Defendants–Appellants.**

No. 97–1127.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1997.

Decided March 24, 1998.

Jonathan H. Margolies, Michael, Best & Friedrich, Milwaukee, WI, Judith A. Rogosheske (argued), Best & Flanagan, Minneapolis, MN, for Plaintiffs–Appellees.

Mark J. Briol, Minneapolis, MN, Thomas S. Sleik, Hale, Skemp, Hanson & Skemp, LaCrosse, WI, Gregory L. Wilmes (argues), Wilmes & Associates, Minneapolis, MN, for Defendants–Appellants.

Before CUMMINGS, WOOD, JR., and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This is a somewhat unusual case raising questions about the court's authority to decide whether a particular dispute is arbitrable, as well as the merits of a district court decision refusing to stay proceedings for an arbitration. Its atypical character arises from the fact that the parties before us—Dr. Charles W. Flume and others associated with him, on the one hand, and securities brokers Kevin Miller, Wesley C. Hayne, and E. Chris Farni (to whom we refer as "the brokers"), on the other—have already arbitrated the Flumes' claim against the brokerage firm with which Miller and his colleagues were affiliated, the arbitral panel has rendered a final award, and the district court has confirmed the award. See *Hayne, Miller & Farni, Inc. v. Flume*, 888 F.Supp. 949 (E.D.Wis.1995) (*Flume I*). The Flumes commenced the arbitration that is the subject of the present appeal when the firm dissolved and, they claim, its officers fraudulently transferred the firm's assets to avoid paying the arbitral award in the Flumes' favor of some $178,034 plus interest. The brokers promptly repaired to federal court to enjoin the second arbitral proceeding, and in a proceeding held by consent before the magistrate judge, the court obliged them. The Flumes appealed from the injunction under 9 U.S.C. § 16(a)(2). As we explain below, the district court erred in enjoining the arbitration; we therefore reverse.

**I**

At this stage, the underlying dispute between the parties is of little relevance, although those who are interested may find a description of it in the district court's opinion confirming the first arbitral award. *Flume I*, 888 F.Supp. at 951. In brief, the appellants (to whom we refer collectively as the Flumes) are Dr. Charles W. Flume, his wife Nancy Flume, Dr. Flume's professional corporation, and the benefit plan it established under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* From May 1990 until approximately 1992 or

1993, the Flumes had an account with broker-dealer Hayne, Miller & Farni, Inc. (HMF), a member firm of the National Association of Securities Dealers (NASD). The broker-appellees, Hayne, Miller, and Farni, were officers and directors of HMF. In June 1993, the Flumes began an arbitration under the rules of the NASD against their HMF broker (James D. Peterson) and against HMF itself, in which they alleged violations of ERISA, state and federal securities fraud, common law fraud, breach of fiduciary duty, and negligence. On March 15, 1994, the NASD panel found HMF liable to the Flumes and awarded them $150,000 in damages and $28,034.40 in costs. (It awarded nothing against Peterson, who had filed for bankruptcy during the arbitration.) HMF then filed an action with the district court for the Eastern District of Wisconsin for vacatur of the award, and the Flumes responded with a counterclaim asking for confirmation of the award. On May 24, 1995, the district court denied HMF's motion and granted the Flumes' request for confirmation, entering a judgment for the total amount due of $178,-034 plus interest. *Flume I*, 888 F.Supp at 955. The Flumes then learned that HMF had ceased operations while the motion for vacatur was pending in the district court. To this day, HMF has not paid any part of the judgment; instead, on December 31, 1994, it filed for withdrawal of its broker/dealer license with the NASD, which granted the request effective January 23, 1995.

The Flumes subsequently learned that while the arbitration and HMF's appeal were pending, the broker-appellees had transferred assets away from HMF. They claim that in 1993, HMF transferred investment securities with an approximate market value of $1,175,000 at the date of transfer to its parent company, HMF Holdings, Inc., and recorded the transaction as a reduction of additional paid-in capital. They also claim that HMF paid its parent another $450,000 in "management fees" over the same time period, which brought the total outflow up to about $1,625,000. Later, in November 1994 (again while HMF's vacatur action in the district court was pending), the Flumes claim that broker Miller transferred other valuable assets of HMF, including its customer accounts and retail brokerage force, to a new brokerage firm, Miller Financial Group, which Miller controlled. That firm continues to operate, they allege, and to reap the benefit of the assets transferred from HMF.

Frustrated that HMF had not satisfied the arbitral award against it, and with this new information in hand, the Flumes initiated a second NASD arbitration. This claim, filed in October 1995, alleged that Hayne, Miller, and Farni were "former principals and control persons" of HMF. It went on to claim that they had participated in the fraudulent acts that HMF had perpetrated on the public, and that they had failed to discharge their legal duty to supervise properly HMF's representatives, including broker Peterson. It also described the alleged fraudulent transfers about which they had learned, and claimed that the brokers had taken these actions to avoid paying the arbitral award in favor of the Flumes. All of these actions, they alleged, violated various rules of the NASD, and for that reason they claimed the right to bring the second arbitration under the NASD's rules.

When the Flumes began the second arbitration, they signed a "Uniform Submission Agreement," which is a form prescribed by the NASD. The brokers had each signed NASD Form U–4, which is a registration document that the NASD requires brokers to execute when they become registered NASD broker-dealers. Paragraph 5 of Form U–4 reads as follows:

> 5. I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register, as indicated in item 10 as may be amended from time to time.

The pertinent organization referred to in item 10 for these brokers is the NASD itself. Upon receiving the Flumes' second Statement of Claim, the NASD served it upon the brokers with a cover letter stating that "[t]he Statement of Claim is being sent to you because you also signed an agreement to arbitrate disputes involving yourself and

claimant." Its letter indicated that the place of the arbitration would be Milwaukee, Wisconsin; the initial hearing was later scheduled for March 26 and 27, 1996.

The brokers did not welcome the prospect of a second arbitration. They turned instead to the federal court, filing the present lawsuit on January 8, 1996. Their complaint sought a declaration that the brokers were not required to arbitrate with the Flumes, and a preliminary and permanent injunction barring the Flumes from pursuing their new NASD arbitration. After a hearing by consent on October 4, 1996 before a magistrate judge, see 28 U.S.C. § 636(c)(1), the district court granted the brokers' motion for a preliminary injunction. *Miller v. Flume*, No. 96–C0029, memorandum and order at 11 (E.D.Wis. Dec. 26, 1996) (*Flume II*). Relying on this court's decision in *Edward D. Jones & Co. v. Sorrells*, 957 F.2d 509, 514 n. 6 (7th Cir.1992), the court first ruled that section 35 of the NASD Code of Arbitration Procedure, on which the Flumes relied, is not the kind of "clear and unmistakable expression of the parties' intent to have arbitrators, not the court," determine the threshold question of arbitrability. *Flume II* at 6. Looking at the complaint, the court then decided that it fell outside the scope of the NASD arbitration agreement, both because the Flumes were no longer "customers" within the meaning of section 12(a) of the NASD Code of Arbitration Procedure, and because a dispute over the collection of a judgment was not a claim "arising in connection with" transactions in the Flumes' accounts. *Id.* at 8.

## II

The initial question we must answer is who should decide the question of the arbitrability of this second round dispute between the Flumes and the brokers: the court, or the NASD arbitrators? Our starting point is the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), in which the Court made clear that "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . so the question 'who has the primary power to decide arbi-

trability' turns upon what the parties agreed about that matter." *Id.* at 943, 115 S.Ct. at 1923 (emphasis in original). Because the preliminary question about the competent forum is so fundamental, however, the Court cautioned that lower courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 944, 115 S.Ct. at 1924 (internal quotes and brackets omitted). We must therefore review the documents constituting the arbitration agreement between the Flumes and the brokers to see if such clear and unmistakable evidence is present here.

■ The Flumes urge us to find this kind of unambiguous entrustment of the arbitrability issue to the arbitrators in the NASD Manual's Code of Arbitration Procedures. They rely on three sections of the Code, which taken together lead to this result in their view. First is Part I, § 1 governing "Matters Eligible for Submission" to arbitration, which reads in pertinent part:

> This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(3) of the By–Laws of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, . . . :
>
> > (c) between or among members or associated persons and public customers, or others; . . . .

See 1997 NASD Manual: Code of Arbitration Procedure (CCH) ¶ 7511 (currently designated as Rule 10101). Next is Part III, § 12(a) for "Required Submission," which specifically addresses disputes between customers and NASD members:

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

See 1997 NASD Manual: Code of Arbitration Procedure (CCH) ¶ 7571 (currently designated as Rule 10301(a)). Last, and most directly relevant to the arbitrability issue, is Part III, § 35 on "Interpretation of Provisions of Code and Enforcement of Arbitrator Rulings," which describes the scope of the arbitrators' authority in the following terms:

> The arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code and to take appropriate action to obtain compliance with any ruling by the arbitrator(s). Such interpretations and actions to obtain compliance shall be final and binding upon the parties.

See 1997 NASD Manual: Code of Arbitration Procedure (CCH) ¶ 7581 (currently designated as Rule 10324). The Flumes' argument from these provisions is straightforward: their "dispute" with the brokers "arose out of," or at the very least "in connection with," their securities business; the brokers themselves were either "members" or "associated persons" and the Flumes were "customers" of their firm, which meant that the dispute was arbitrable upon their demand; and section 35 is broad enough to require the arbitrators to adjudicate any particular disputes about the scope of sections 1 or 12(a).

Some circuits have accepted this general argument, bearing in mind the hospitable approach the Supreme Court has taken to arbitration in recent years. See, *e.g., Paine-Webber, Inc. v. Bybyk,* 81 F.3d 1193, 1202 (2d Cir.1996); *FSC Sec. Corp. v. Freel,* 14 F.3d 1310, 1312–13 (8th Cir.1994) (language of section 35 indicates that parties "clearly and unmistakably" wanted questions of arbitrability to be decided by arbitrator). This court adopted a different approach to section 35 in *Sorrells,* where the question was whether the court should conclude that section 15 of the NASD Code (now Rule 10304) imposes an absolute bar to arbitration for claims more than six years old, or if arbitrators should decide what its effect would be. See *Sorrells,* 957 F.2d at 514 n. 6, which quoted section 35 and commented that:

> we do not believe that this provision is a clear and unmistakable expression of the

parties' intent to have the arbitrators, and not the court, determine which disputes the parties have agreed to submit to arbitration.

*Id.* Other courts have agreed with us. See *Smith Barney, Inc. v. Sarver,* 108 F.3d 92, 96–97 (6th Cir.1997); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cohen,* 62 F.3d 381, 384 (11th Cir.1995).

The Flumes have urged us to reconsider our conclusion in *Sorrells,* or at a minimum to distinguish limitations-of-actions cases arising under section 15 from cases arising under other provisions of the Code. With all due respect to the courts that have taken the other position, we are not inclined to revisit *Sorrells* in the present case. *First Options,* which was decided after *Sorrells,* approved our requirement of a showing of "clear and unmistakable" evidence that the parties intended to have the arbitrators decide the preliminary issue of arbitrability. Section 35 says nothing about arbitrability; it instead empowers the arbitrators to "interpret and determine the applicability of all provisions under this Code." However, both interpretation and determinations about applicability are steps that take place after the threshold determination of arbitrability has occurred; or, at the very least, section 35 can reasonably be read that way. Even if it would not do violence to the language of section 35 to conclude that arbitrability may also be resolved by the arbitrators, this is not the kind of clear and unmistakable language that *First Options* requires. We therefore agree with the district court that the issue of arbitrability here was properly one for the court to resolve.

 On this appeal from the district court's grant of a preliminary injunction against the Flumes' second arbitral proceeding, we can reverse only if the district court abused its discretion. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211, 215 (7th Cir.1993). Nevertheless, as the Supreme Court has pointed out, a district court abuses its discretion if it relies on an erroneous view of the law or on a clearly erroneous assessment of the evidence. See *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110

L.Ed.2d 359 (1990). The district court's interpretations of the NASD Code are reviewable *de novo*. See *Cogswell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 78 F.3d 474, 476 (10th Cir.1996). Since the Code sets forth the applicable agreement to arbitrate, the likelihood of the brokers' success on the merits of their action for declaratory and injunctive relief depends entirely on the correctness of the district court's interpretation of its language.

■ The district court did not address the question whether the brokers were "members or associated persons" as the NASD defines those terms, perhaps because it thought the matter beyond dispute. We agree that it is clear that they were, and thus that brokers Hayne, Miller and Farni fall within the ambit of sections 1 and 12(a). The NASD by-laws define the term "member" to include "any broker or dealer admitted to membership in the [NASD]." See 1997 NASD Manual: By–Laws (CCH) ¶ 1041 (art. I, definition (m)). The terms "person associated with a member" and "associated person of a member" mean "every ... officer, director, or branch manager of any member...." See *id.* at ¶ 1042 (art. I, definition (q)). Even if the brokers were not individual members of the NASD, their firm Hayne, Miller & Farni, Inc., was a member of the Association. As officers and directors of HMF, the brokers are therefore "associated persons" under definition (q), and are subject to the arbitration requirements. *Cf. Menke v. Monchecourt*, 17 F.3d 1007, 1008 (7th Cir. 1994) (executive vice-president of NASD member was "associated person" for purpose of arbitration under the Code).

■ The magistrate judge found, however, that the Flumes could not be considered "customers" for purposes of their second arbitration proceeding because "the allegedly fraudulent transfers and conveyances ... occurred when the Flumes were not customers of HMF and when the Flumes had no relationship with plaintiffs Miller, Hayne, and Farni." *Flume II* at 8. In so holding, she relied on the decisions in *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814 (11th Cir.1993), and *Gruntal & Co. v. Steinberg*, 854 F.Supp. 324 (D.N.J.1994), *aff'd*, 46 F.3d 1116 (3d Cir. 1994) (table). Although these cases admittedly cast some light on the meaning of the term "customer" in the NASD Code, in our view the magistrate judge overlooked important distinctions between the situations presented there and the case before us.

In *Wheat*, the investor-plaintiffs had held accounts with Marshall Securities, a broker-dealer firm. *Wheat*, 993 F.2d at 815. Suspecting that an agent for that firm had made material misrepresentations to them in connection with a stock purchase, they instituted arbitration proceedings against Wheat First, a successor-in-interest to certain of Marshall Securities' assets and contracts. *Id.* However, Wheat First had signed this Asset Purchase Agreement with Marshall Securities "[w]ell after" the allegedly fraudulent stock transactions had taken place; it had not been involved with any of the problematic stock purchases. *Id.* Although the investors had eventually become customers of Wheat First by virtue of the Asset Purchase Agreement, the court held they were not Wheat First's "customers" within the meaning of the NASD Code with respect to the contested transactions, because it was undisputed that they were not customers of Wheat First at the time the transactions took place. *Id.* at 820. The court therefore ruled that the determination of an investor's customer status had to be made as of the time of the events that formed the basis of their claim. *Id.* The court commented that it could not "imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer." *Id.*

The situation in *Gruntal* was similar. There the investors initiating the arbitration had held accounts with the Philips securities brokerage firm. *Gruntal*, 854 F.Supp. at 328–29. As in *Wheat*, Gruntal had signed an Asset Purchase Agreement by which it purchased certain specified assets from Philips. 854 F.Supp. at 329. In their arbitration claim against Gruntal, the investors alleged that two of Philips' customer representatives had failed to follow their instructions regarding their accounts during a period prior to

Gruntal's purchase of the assets. *Id.* at 330–31. Gruntal had no part in Philips' alleged misconduct; prior to the purchase, it had no association with Philips' business. *Cf. id.* at 329. Expressly following *Wheat,* the *Gruntal* court concluded that the acts at issue occurred before the investors became "customers" of the Gruntal firm and that the firm was therefore not required to arbitrate the claim. *Id.* at 339–40.

We have no quarrel with *Wheat's* holding that an investor is not a "customer" of an NASD firm for purposes of claims that arose while the claimant was a customer of a predecessor-in-interest, at least in the absence of any contractual provisions to the contrary in the asset purchase agreement. But our case presents an entirely different situation. The Flumes were customers of HMF at the time the initial fraudulent activities took place, and all of their claims against both HMF (in the initial arbitration) and its associated persons (in the second arbitration) arise out of that direct customer-broker relationship. The judgment debt they are trying to collect is one that ran from HMF to them as the firm's customers. None of the risks of remote liability that motivated the *Wheat* court exist here. Hayne, Miller, and Farni are not being asked to assume responsibility for the actions of stranger firms with whom they are linked only by an asset purchase. Instead, these persons associated with HMF will be potentially liable only to individuals who were customers of the firm while it was in operation, and only for actions that arose out of or were connected with the firm's business. *Cf. Robinson v. Shell Oil Co.,* —U.S. ——, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (former employees may sue for retaliation under Title VII for actions that occurred or arose out of employment relationship).

■ Having concluded that Hayne, Miller, and Farni are properly "associated persons" and that the Flumes are "customers," the only remaining question is whether under section 1 of the Code, the Flumes' dispute arose "out of" or "in connection with" a dispute between or among an NASD member (or its associated persons) and a public customer. See 1997 NASD Manual: Code of Arbitration Procedure (CCH) ¶ 7511. Section 12(a) explicitly makes claims "arising in connection with" transactions between a customer and an associated person arbitrable under the Code. See *id.* at ¶ 7571. The brokers argue (and the magistrate judge below agreed) that we should take a very narrow view of this language and find that HMF's business was limited to the buying and selling of securities. See *Flume II* at 9. Thus, since the Flumes' present claims involve alleged "fraudulent conveyance" rather than the "buying and selling of securities," the brokers reason that they fall outside the scope of the § 12(a) arbitration clause. We disagree.

■ As we have previously noted, once it is clear the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration. See *Flexible Mfg. Sys. Pty., Ltd. v. Super Prods. Corp.,* 86 F.3d 96, 99 (7th Cir.1996). We have already concluded that the parties here were subject to an arbitration agreement of some scope, because they were respectively "associated persons" of an NASD member and its "customers." Moreover, the language of this particular agreement to arbitrate is quite broad, sweeping in not only claims that literally "arise out of" the business of the firm (i.e., its buying and selling activities), but also claims that have a "connection" with the firm's business. Furthermore, NASD firms (and associated persons) have a duty under IM–10100(d) of the Code to honor an arbitral award that has been rendered pursuant to the procedures specified by the NASD. See 1997 NASD Manual: Code of Arbitration Procedure (Administrative Provisions) (CCH) ¶ 7511 (interpretive material). Therefore, we find that an alleged failure to abide by that standard of behavior vis—vis a party entitled to invoke arbitration, is as much a problem "arising out of" the firm's (or its associated persons') conduct of NASD-authorized business as the underlying "purchase and sale of securities" would be. *Cf. Royal Alliance Assocs., Inc. v. Davis,* 897 F.Supp. 783, 788–89 (S.D.N.Y. 1995) (broker's unauthorized borrowing and misappropriation of client funds, and broker-

age firm's failure to supervise properly, were subject to arbitration under § 12(a) as controversies "in connection with the business" of a member). See also *Tracer Research Corp. v. National Envtl. Svcs. Co.,* 42 F.3d 1292, 1295 (9th Cir.1994) (noting that language like "relating to" indicates an arbitration clause considerably broader in reach than one limited to disputes "arising out of" certain dealings).

In this court, the Flumes have argued in the alternative that their second arbitral complaint alleges direct liability on the part of the brokers in their capacity as control persons of HMF. The brokers respond that this argument was never made in so many words to the district court. Because we agree with the Flumes that their dispute is arbitrable, even as an effort to pursue the brokers for funds that should have been available to satisfy the judgment against HMF, we need not decide whether the Flumes preserved this point for appeal. (This is not a case like *Peacock v. Thomas,* 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), in which the plaintiffs are attempting to rely on a form of ancillary jurisdiction to pursue someone who has impeded the collection of a valid judgment. The Flumes have asserted that the brokers' own obligations under the NASD Code support arbitrability and give rise to the duties they assert.) It will be up to the arbitrator to decide whether the control person argument is properly before it, given that the Flumes have already had one chance to fix blame for the earlier transactions on a responsible party.

Because the district court erred in its interpretation of the NASD Code and gave the arbitration provisions too narrow a reading, it necessarily erred in assessing the brokers' likelihood of success on the merits for purposes of the requested preliminary injunction. This was an abuse of discretion. We conclude that the Flumes' claims are arbitrable as a matter of law under the NASD Code, and that the district court should have dismissed the brokers' action in its entirety, since it asks for nothing but relief against the arbitral proceedings. We therefore VACATE the preliminary injunction granted by the district court and REMAND with instructions

that the case be dismissed so that the Flumes' arbitration proceeding may go forward.