# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 08-1699

ANGUS M. DUTHIE and MICHAEL J. CONDRON,

*Plaintiffs-Appellees,*

*v.*

MATRIA HEALTHCARE, INC.,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5491—**Jeffrey N. Cole**, *Magistrate Judge.*

————————

ARGUED MAY 27, 2008—DECIDED AUGUST 28, 2008

————————

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This case arises out of the merger of CorSolutions Medical, Inc. with a subsidiary of Matria Healthcare, Inc., in a deal worth hundreds of millions of dollars. Angus Duthie and Michael Condron were CorSolutions officers prior to the merger. We consider in this appeal whether the merger agreement mandates arbitration of fraud claims that Matria asserts

against Duthie and Condron individually, seeking recovery from their personal assets. Because we conclude the agreement does not require these claims to be arbitrated, we affirm the district court's decision to enjoin Matria from pursuing the claims in a pending arbitration proceeding.

## I. BACKGROUND

Matria and CorSolutions provide services to employers, health plans, and government-sponsored health care programs. Pursuant to an Agreement and Plan of Merger signed December 14, 2005 (the "Agreement"), CorSolutions agreed to merge with Coral Acquisition Corp., a Matria subsidiary. CorSolutions became the surviving corporation after the merger and a wholly-owned subsidiary of Matria. The merger agreement spanned seventy-one single-spaced pages.

Angus Duthie and Michael Condron, the plaintiffs in this case, were CorSolutions officers. Duthie was its chairman and Chief Executive Officer, and Condron served as the president and Chief Operating Officer. The two remained CorSolutions officers for a time after the merger. At the time of the merger, Duthie owned CorSolutions shares that represented a 0.45% ownership interest in the company. Condron did not own any CorSolutions shares when the Agreement was signed but became a shareholder sixteen days later, when he exercised options and acquired 124,000 shares of CorSolutions's common stock, which comprised about 2.4% of the company's outstanding shares at the time. Duthie signed the Agree-

ment, but only in his capacity as chairman and CEO. Condron did not sign the Agreement.

Pursuant to the Agreement, $20.3 million went into the Escrow Account, an account set up to satisfy certain potential post-closing claims and adjustments contemplated by the Agreement. The Agreement appointed Coral SR, LLC as the "Stakeholder Representative," meaning that it was "constituted to act as the representative, agent, and attorney-in-fact for the Stakeholders and their successors and assigns . . . for all purposes under this Agreement, the Escrow Agreement and the Agent's Escrow Agreement." Agrt. § 2.4(a). The Agreement defines the "Stakeholders" as "the holders of Common Stock, the holders of Preferred Stock, the holders of Company Options and the holders of Company Warrants." Agrt. § 1.1. Duthie and Condron are both "Stakeholders" under the Agreement's definition of the term.

The Agreement provides for four different arbitration forums. The Settlement Accountant, an independent accounting firm, is to resolve post-closing disputes over balance adjustments and working capital computations. Agrt. § 2.9(b). A Tax Arbitrator, a senior tax partner in a mutually agreeable accounting firm, would resolve any tax-related matters. Agrt. § 5.12(h). The BIPA Arbitrator is to resolve disputes concerning a refund CorSolutions owed to the Centers for Medicare & Medicaid Services. Agrt. § 7.5(d). And, in the section most relevant to this case, section 7.4 provided for arbitration of certain disputes in accordance with the Commercial Arbitration rules of the American Arbitration Association ("AAA").

We would not be here, of course, if all had gone smoothly. Instead, according to Matria, the very day after the merger closed, one of CorSolutions's customers informed Matria that it planned to conduct an audit of CorSolutions's disease management programs. That was news to Matria, and it maintains that CorSolutions and its officers knew about the customer's concerns before the merger but failed to convey them to Matria.

In October 2006, Coral SR initiated AAA arbitration proceedings against Matria. Matria responded by filing a suit in the Delaware Court of Chancery seeking to enjoin the arbitration and asserting claims against Coral SR based on alleged inaccuracies in the Agreement's representations and warranties. Matria did not sue any individuals in the Delaware case. On March 1, 2007, the Delaware court held that the Agreement required arbitration of the fraud claims that Matria had asserted against Coral SR seeking recovery from the Escrow Fund. *Matria Healthcare, Inc. v. Coral SR LLC*, No. 2513-N, 2007 WL 763303, at * 9 (Del. Ch. Mar. 1, 2007).

Two months later, Matria asserted counterclaims in the AAA arbitration against Coral SR for fraud, equitable fraud, and breach of contract. Matria also asserted counts of fraud, equitable fraud, and breach of contract against Duthie and Condron in the same filing, alleging that the two had knowingly withheld information and made multiple misrepresentations. Duthie and Condron then moved to dismiss the claims against them in arbitration for lack of jurisdiction. The arbitration panel denied the motion. Duthie and Condron subsequently filed a com-

plaint seeking a declaration that Matria's claims against them were not arbitrable and a preliminary injunction preventing Matria from proceeding against them in the arbitration. The magistrate judge entered an order preliminarily enjoining Matria from proceeding in the arbitration against Duthie and Condron, and Matria appeals from that decision.

## II. ANALYSIS

This case involves a complex transaction that yielded complex documentation; we begin with first principles. "Although the Federal Arbitration Act favors resolution of disputes through arbitration, its provisions are not to be construed so broadly as to include claims that were never intended for arbitration." *Continental Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 730 (7th Cir. 2005) (quoting *Am. Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir. 2003)). That is, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted).

Whether a particular dispute must be arbitrated is generally a question for judicial determination, unless the parties "clearly and unmistakably" provided otherwise in their agreement. *Id.* Neither party disputes that the court, and not the arbitration panel, should decide the arbitrability question in this case. Nor is there clear and unmistakable evidence to the contrary in the Agreement, and so we proceed.

Whether the parties agreed to arbitrate is a matter of state contract law. *Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 806 (7th Cir. 2003). In this case, Delaware law controls. Agrt. § 9.6. As with any contract, our task is to interpret the Agreement in a manner that satisfies the "reasonable expectations of the parties at the time they entered the contract." *Dittrick v. Chalfant*, 948 A.2d 400, 406 (Del. Ch. 2007) (citation omitted). We are nonetheless mindful that the Federal Arbitration Act "'is a congressional declaration of a liberal federal policy favoring arbitration agreements' and 'that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Continental Cas. Co.*, 417 F.3d at 730-31 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).

This case comes to us on appeal from the grant of a preliminary injunction, and the relevant inquiry in this case is whether Duthie and Condron demonstrated a likelihood of success on the merits. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (listing factors court should consider when determining whether to grant preliminary injunction). We ultimately review whether a district court should have granted a preliminary injunction for an abuse of discretion. *Miller v. Flume*, 139 F.3d 1130, 1134 (7th Cir. 1998). The likelihood of the success on the merits in this case depends on the soundness of the district court's interpretation of the Agreement's language, *see id.* at 1135, however, and we review a district court's interpretations of the merger agreement de novo, *see Fyrnetics*

*Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002).

The question on appeal is whether the Agreement mandates arbitration before the AAA of the claims Matria asserted against Duthie and Condron in the AAA proceeding. These claims allege that Duthie and Condron made fraudulent misrepresentations and omissions both in person and in the Agreement, and they seek recovery from Duthie and Condron's personal assets. Matria argues that these claims must be arbitrated because: (1) it contends that the Agreement mandates that *any* claim involving misrepresentations or omissions arising out of the merger must be arbitrated, and (2) according to Matria, the Delaware Court of Chancery already said they must be.

### A. The Agreement does not require arbitration of all claims.

As support for its argument that the Agreement requires arbitration of all claims arising out of the Agreement, Matria turns principally to certain language in section 7.3(d)(ii). This section provides in full:

> In accordance with the terms of the Escrow Agreement, for a period of twenty-four (24) months after the Closing Date, Parent shall be entitled to make claims against the Escrow Fund with respect to Damages arising out of or resulting from, or amounts payable with respect to, the matters set forth in Section 7.1 (other than Section 7.1(a), which is the subject of Section 7.4(d)(i) and subject to

the limitation in Section 7.3(d)(iii); it being under-stood that in the event Parent shall have timely delivered notice of any claim on the Escrow Fund pursuant to Section 7.1, such claim shall survive until such time as such claim is finally resolved. The parties intend to shorten the statute of limita-tions and agree that, after the Closing Date, *any claim or cause of action against any of the parties hereto, or any of their respective directors, officers, employees, Affiliates, successors, permitted assigns, or Representa-tives based upon, directly or indirectly, any of the representations or warranties, covenants or agreements contained in this Agreement, or any other agreement, document or instrument to be executed and delivered in connection with this Agreement may be brought only as expressly provided in this Article VII.*

(Emphasis added.)

We do not agree that the portion of the provision we italicized above mandates arbitration of any claim alleging that a director or officer made misrepresent-ations in the Agreement. Consistent with section 7.3(d)'s "Survival of Representations and Warranties; Claims Period" heading, the point of this section is to shorten the statute of limitations for claims against the Escrow Fund. Shortening the time period for bringing such claims reflects a reasonable desire for finality concerning the amount in the Fund so that the remainder can be distrib-uted to the Stakeholders within a reasonable period of time. And although section 7.3(d)(ii) expressly mentions directors and officers, it does not state that any claim

against a director or officer is arbitrable. Instead, it provides that claims against directors and officers may be brought "only" as "expressly provided" in Article VII.

Nothing in Article VII expressly provides for arbitration of claims against individual defendants for their personal assets. Instead, consistent with its heading, "Claims on Escrow Funds," Article VII only provides for arbitration of claims against the Escrow Fund. Ten and a half pages long, Article VII sets forth detailed provisions relating to claims on the "Escrow Fund," a term it mentions over forty times. Section 7.1 sets forth the circumstances under which Matria can make a claim against the Escrow Fund. Section 7.2 specifies the claims process. Section 7.3 details certain limitations on claims. For example, section 7.3(b) specifies that the maximum liability for Matria's claims on the Escrow Fund is the amount in the Escrow Fund, and it further provides that neither Coral SR nor any Stakeholder has any obligation to contribute money to the Escrow Fund under any circumstance.

The next section, section 7.4, is critical to this case. It provides:

> Section 7.4. <u>Disputes</u>. In the event of a post-Closing dispute between the Parent and the Stakeholder Representative relating to any Claim other than a Third Party Claim that is the subject of litigation ("Escrow Fund Dispute") or any claim subject to Section 5.12 or Section 7.5, the Stakeholder Representative and Parent shall seek in good faith to negotiate a resolution of such Escrow Fund Dispute within ninety (90) days of receipt by the

> Stakeholder Representative of a Claim Notice. If the Stakeholder Representative and Parent are not able to resolve such Escrow Fund Dispute, all of the parties hereto agree that such Escrow Fund Dispute shall be exclusively and finally settled by arbitration in accordance with the Commercial Arbitration Rules of the AAA . . . .

Section 7.4, then, only mandates the arbitration of an "Escrow Fund Dispute." The dispute here is neither between the proper parties nor of the proper subject to constitute an "Escrow Fund Dispute" under the Agreement. First, the dispute is not one "between the Stakeholder Representative and Parent," the entities that section 7.4 defines as the parties to an "Escrow Fund Dispute." The Agreement defines the "Parent" as Matria and the "Stakeholder Representative" as Coral SR. But the claims at issue in this appeal are between Matria and individual officers. *Cf. Matria Healthcare, Inc.*, 2007 WL 763303 (suit between Matria and Coral SR).

The Agreement also not equate the "Stakeholder Representative" to the individual "Stakeholders" (nor does Matria argue that it does). The Agreement specifies that the "Stakeholder Representative" is Coral SR, and that Coral SR acts as the representative for the individual "Stakeholders" for purposes under the Agreement. When referring only to these individuals, the Agreement uses the term "Stakeholder" or "Stakeholders". *See, e.g.*, Agrt. §§ 2.3(a), 2.9(c), 2.14, 3.17, 7.3(b), 8.2, 9.10. Section 7.4, however, only refers to disputes in which the "Stakeholder Representative" is a party.

In addition, the recovery Matria seeks in its claims against the individual officers is not of the type that section 7.4 makes arbitrable as an "Escrow Fund Dispute." We note first that although the claims Matria filed in arbitration against Coral SR and Duthie and Condron asked for recovery from the Escrow Fund as well as from Duthie and Condron's personal assets, Matria readily acknowledges that it could only obtain recovery from the Escrow Fund by arbitrating claims against Coral SR. Opening Br. at 19, Reply Br. at 2 n.2. The question at issue in this appeal, then, only concerns claims for personal assets.

Such claims do not fall within the scope of section 7.4, which only compels arbitration of claims on the Escrow Fund. To fall within section 7.4's purview, a dispute must relate to a "Claim," which the Agreement defines to include "Third Party Claims" (not relevant here) and "Direct Claims." A "Direct Claim" under the Agreement is one where the "Parent shall be entitled to make a claim for Damages pursuant to Section 7.1." Agrt. § 7.2(a). A claim for "Damages" under section 7.1 is a claim "*against the Escrow Fund* in accordance with the terms of the Escrow Agreement." (Emphasis added.) Because the claims at issue seek recovery from Duthie and Condron's personal assets, not from the money in the Escrow Fund, section 7.4 does not apply to these claims.

The text of Article VII as a whole reinforces this conclusion. The parties seemed to approach Article VII, the section entitled "Claims on Escrow Fund," with particular care. It alone takes up over ten pages with detailed provi-

sions including a shortened statute of limitations, a prohibition on punitive damages, and a ceiling for liability. Yet it does not state anywhere that claims for amounts from sources other than the Escrow Fund must be arbitrated.

The other provision to which Matria turns in support of its position that the Agreement requires arbitration of all, or at least nearly all, claims, section 9.7, also does not help it. Section 9.7 has two (very long) sentences. The first reads:

> Consent to Jurisdiction. Except as provided in Sections 2.9 (Post-Closing Adjustment of Initial Merger Consideration), 5.12(h) (Tax Disputes), 7.4 (Escrow Fund Disputes) and 7.5 (BIPA Claims) herein, each of the parties hereto: (a) irrevocably consents to submit itself to the personal jurisdiction of any state or federal court of competent jurisdiction located in the City of Wilmington in the State of Delaware, for the purpose of any action or proceeding arising out of this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that, except in any action brought against the party in another jurisdiction by an independent third party, it will not bring any action relating to this Agreement or any transactions contemplated by this Agreement in any court other than a state or federal court of competent jurisdiction located in the City of Wilmington

in the State of Delaware, except for the purpose of enforcing any award or decision.

And the second sentence says:

For the avoidance of doubt, *except for claims for specific performance arising after the date hereof and prior to the Closing, any claims arising out of this Agreement, or the breach, termination or validity thereof, shall be finally and exclusively determined by arbitration* in accordance with Sections 2.9 (Post-Closing Adjustment of Initial Merger Consideration), 5.12(h) (Tax Disputes), 7.4 (Escrow Fund Disputes) or 7.5 (BIPA Claims).

(Emphasis added.) Matria contends that the use of "any claims" in the second sentence can only mean that any and all claims arising out of the Agreement, save for specific performance claims that the first sentence specifically excludes, must be arbitrated.

Although this section could have been written more clearly, we do not read it to mandate arbitration of all claims arising out of the Agreement. Matria attempts to place section 9.7 on par with all-encompassing arbitration clauses such as the one in *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909-10 (7th Cir. 1999), which stated that "any controversy or claims arising out of or relating to . . . the Agreement . . . shall be settled by arbitration." We read those clauses broadly and attach a presumption of arbitration. *See id.* Here, however, the second sentence in section 9.7 does not end with the statement that any claims arising out of the agreement

"shall be finally and exclusively determined by arbitration"; instead, the sentence states that the claims "shall be finally and exclusively determined by arbitration *in accordance with*" (emphasis added) four specific sections in the agreement. *Cf. Wellborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002). None of the four sections listed in section 9.7's second sentence required arbitration in this case, and we do not read this section to mandate arbitration in instances that fall outside the scope of those four sections.

Reading section 9.7 as a whole supports Duthie and Condron's position. The first sentence of the section provides that "except as" provided in four specific sections, the parties agreed to jurisdiction in federal or state courts in Delaware "for the purpose of any action or proceeding arising out of this Agreement." If all claims arising out of the Agreement were arbitrable as Matria maintains, there would be little need to consent to jurisdiction in Delaware for "any action or proceeding arising out of" the Agreement. And as the district court recognized, it would seem odd that the parties to the Agreement meant to expand substantially the claims for which arbitration is mandatory by a single sentence at the end of a "Consent to Jurisdiction" section.[1]

---

[1] We note that although section 7.3(d)(ii) might suggest that Matria would be left without a place to bring a claim of fraud against individual officers if the claim could not be arbitrated under Article VII, Duthie and Condron do not go that far. They acknowledged to us that a court would be the proper forum for Matria's fraud claims against them.

### B. The Delaware Court of Chancery did not address the issue before us.

Matria also argues that the district court's decision conflicts with the Delaware Court of Chancery's determination that Matria's fraud claims against Coral SR were arbitrable under the Agreement. Article VII mentions fraud claims in section 7.3(d)(iv), which provides in part:

> . . . except for claims involving fraud [and certain other causes of action], from and after the Closing, the right to make a claim on the Escrow Fund provided for in this Article VII pursuant to the provisions of this Article VII . . . shall be the exclusive remedy of Parent . . . for any breach of or inaccuracy in any representation or warranty or any non-compliance with or breach of or default in the performance of any of the covenants or agreements contained in this Agreement . . . .

Section 7.3(d)(iv) makes clear that Matria's recourse for fraud is not limited to a claim on the amount in the Escrow Fund. But the section does *not* state that all fraud claims must be arbitrated before the AAA; in fact, the section does not specify any forum at all for fraud claims. The upshot is that while section 7.3(d)(iv) does not prohibit Matria from asserting a claim on the Escrow Fund on the basis of fraud, the provision also does not require the parties to arbitrate a fraud action that does *not* make a claim on the Escrow Fund. The latter situation is the one we have here.

There are plausible reasons why the parties to the Agreement would have agreed to this approach. The

parties seemed to have wanted claims on the Escrow Fund resolved quickly so that any money left over in the Fund could be distributed to Stakeholders in a timely manner (the Agreement specifies in section 7.6 that the amount remaining in the Escrow Fund after all post-closing adjustments and claims had been satisfied would be distributed to the Stakeholders), hence the Agreement's shortened statute of limitations on Escrow Fund claims. For fraud claims, however, the Agreement does not attempt to shorten the statute of limitations, nor does it attempt to limit Matria's potential recovery. *Cf.* Agrt. § 7.3(b) (maximum amount available to Matria for claims on the Escrow Fund is the amount in the fund at the time, and no one had any obligation to replenish it); Agrt. § 7.3(c)(iv) (term "Damages" in Article VII does not include punitive damages). In turn, a party sued under the Agreement did not surrender procedural protections, including a right to a jury trial, for fraud claims where recovery was not limited by the Escrow Fund cap and punitive damages could be sought.

The Delaware court held that the Agreement required Matria to arbitrate fraud claims against Coral SR that sought money from the Escrow Fund. *See Matria Healthcare*, 2007 WL 763303, at *9 (claims "against the Escrow Fund established by the Merger Agreement must be brought in accordance with the parties' agreement to arbitrate"). That's a far cry from Matria's current fraud claims against individual officers for their personal assets. Matria did not assert any claims against any directors, officers, or Stakeholders individually in the Delaware action, a fact not lost on that court. *See id.* at *8 (noting that Coral SR was

before it only "as the representative of the Stakeholders with respect to Matria's claims to the Escrow Fund and not, at least as alleged in the Verified Complaint, as an attorney-in-fact for individual Stakeholders against whom claims might, at least theoretically, be asserted."). The Delaware court made no ruling about claims against individual Stakeholders as such claims were not before it.

Moreover, unlike here, Matria sought to recover from the Escrow Fund in its Delaware suit. While the extensive provisions in the Agreement regarding claims against the Escrow Fund reflect the drafters' desire to have claims—including fraud claims—properly asserted against the Fund resolved through arbitration, the Agreement contains no such terms regarding individual officers or their assets. Matria points out that its verified complaint in the Delaware action also sought recovery from a source other than the Escrow Fund. But the "other source" was the Agent's Escrow Fund, a fund established to pay the fees for Coral SR and any legal representation Coral SR hired to represent the Stakeholders collectively. The Agent's Escrow Fund, like the Escrow Fund, consists only of funds collectively owned by the Stakeholders and managed by Coral SR; the remaining balance, if any, in both funds will be distributed pro rata to the Stakeholders after all claims against the funds are resolved. Matria's claims in this case are not against Coral SR, and, as it recognizes, it cannot recover from the Escrow Fund for any fraud committed only by Duthie and Condron, who are but two of the many Stakeholders who collectively "own" the Escrow Fund and Agent's Escrow Fund.

Along those same lines, the Delaware court's footnote stating that "Whether Matria's claims are limited to the Escrow Fund is a question for the arbitrator," *id.* at *8 n.37, is not inconsistent with the district court's conclusion that the claims against Duthie and Condron are not arbitrable. Matria had asserted a claim in the Delaware suit against Coral SR for money in the Escrow Fund, making it a claim that had to be arbitrated under the Agreement. Given that the claim had to be arbitrated, the Delaware court concluded it would let the arbitrator decide the scope of the arbitration, including whether the remedy for any fraud committed by Coral SR was limited to the money in the Escrow Fund. That doesn't mean that Matria's fraud claims at issue in this case must be arbitrated, because there isn't a predicate claim against the Escrow Fund here.

We finally note that Duthie and Condron are not collaterally estopped from asserting that Matria's claims against them are not arbitrable. The Delaware court made no determination about claims against individuals like Duthie and Condron, as such claims were not before it. *See Garcia v. Village of Mt. Prospect*, 360 F.3d 630, 634 n.6 (7th Cir. 2004) (collateral estoppel requires that issue of law or fact actually have been litigated and decided in previous action). Judicial estoppel also does not apply, as the Delaware court did not adopt a position that was inconsistent with the one Duthie and Condron raised here. *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

Our examination of the Agreement as a whole leads us to conclude that the Agreement does not mandate arbitra-

tion of the types of claims Matria asserted against Duthie and Condron in the AAA arbitration. As a result, we need not reach Duthie and Condron's alternate arguments in support of affirming the district court's opinion and entry of a preliminary injunction.

### III.  CONCLUSION

The judgment of the district court is AFFIRMED.